McDONALD, *Appellant*, v. KANSAS CITY & INDEPENDENCE RAPID TRANSIT RAILWAY COMPANY.

### In Banc, February 26, 1895.

1. **Carrier:** PASSENGER: NEGLIGENCE: QUESTION FOR JURY. Decedent, a passenger, in alighting at night from a car on a dummy line, with the operation of whose trains he was familiar, was struck by a train running on the opposite track and killed. The train on which he rode had just passed his station but was coming to a stop when he got off. The conductor lighted him off at the steps with a lantern. *Held*, that a *prima facie* case of negligence was made out against the defendant and the question was one for the jury.

2. ———: ———: CONTRIBUTORY NEGLIGENCE: QUESTION FOR JURY. Deceased was not guilty of contributory negligence as a matter of law, though if he had looked he might have seen the approaching train.

*Appeal from Jackson Circuit Court.*

REVERSED AND REMANDED.

*C. F. Moulton* and *James M. Callahan* for appellant.

(1) In *Gratiot v. Railroad*, 116 Mo. 466, Judge BURGESS, speaking for the court, said: "In considering the instruction in the nature of a demurrer to the

evidence, every reasonable intendment in favor of plaintiff to be drawn from the evidence offered by him must be indulged, and the evidence introduced in his behalf regarded as absolutely true." *Miller v. Railroad*, 90 Mo. 394; *Kellogg v. Railroad*, 26 Wis. 223; *Higgins v. Dewey*, 107 Mass. 494; *Memphis, etc., v. Whitfield*, 44 Miss. 466; *Railroad v. Kendrick*, 90 Am. Dec. 332; *Bowen v. Railroad*, 72 Am. Dec. 529; *Railroad v. Kilgore*, 79 Am. Dec. 787. (2) The conductor, with his lighted lantern, directed appellant's husband off the car, between the passing trains, at a place and time when he knew the trains were to pass. This, too, was gross negligence. *Lambeth v. Railroad*, 66 N. C. 422; *Railroad v. Cantrill*, 37 Ark. 519; *Files v. Railroad*, 98 N. Y. 128; *Wand v. Railroad*, 49 Mich. 370; *Brown v. Railroad*, 54 Wis. 342; *Railroad v. Buck*, 96 Ind. 346.

*Karnes, Holmes & Krauthoff* for respondent.

(1) The demurrer to the evidence was properly sustained. *Ryan v. McCully*, 27 S. W. Rep. 533; *Powell v. Railroad*, 76 Mo. 80; *Weber v. Railroad*, 100 Mo. 194; *Carroll v. Transit Co.*, 107 Mo. 653. (2) There is no evidence that plaintiff's husband desired to alight at Evanston station. None of the witnesses were able to tell what passed between the conductor and the deceased in the conversation which occurred just before the accident. But even if deceased was a passenger on defendant's train and defendant were negligent in not stopping at Evanston, his destination, such negligence of defendant (if so it may be called) was not the proximate cause of the accident. And there can be no recovery in this case. *Weber v. Railroad*, 100 Mo. 194; *Sargent v. Railroad*, 114 Mo. 348; *Carroll v. Transit Co.*, 107 Mo. 653; *Railroad v. Kendrick*, 40 Miss. 374;

*Railroad v. Chambers*, 71 Ill. 519; *Railroad v. Ruther-ford*, 29 Ind. 82; *Damont v. Railroad*, 9 La. Ann. 441; *Railroad v. Morris*, 31 Gratt. 200; *Railroad v. Tanker-sey*, 54 Ark. 25. (3) There is no evidence of negli-gence on part of defendant. Common carriers are not guardians of their passengers. *Hurt v. Railroad*, 94 Mo. 255. "It was not to be anticipated that a passen-ger would get off the car where he had no business to do so." *Railroad v. Green*, 81 Ill. 19. "People are not to be treated like cattle; they are presumed to act rea-sonably in all contingencies." *Railroad v. Zebe*, 33 Pa. St. 318. "The company can not be expected to treat its passengers as children, or put them under restraint." *Mitchell v. Railroad*, 51 Mich. 236.

### DIVISION ONE.

BLACK, P. J.—The plaintiff brought this suit to recover $5,000 damages for the death of her husband. The trial court sustained a demurrer to the plaintiff's evidence, and this ruling presents the only question before us. In other words, the question is, whether plaintiff made out a case for the jury.

The defendant owns and operates a railroad from Kansas City to Independence, a distance of about eight or ten miles. The cars are propelled by steam power, and the road is called the dummy line. There are two tracks, the south one being used by trains going from Kansas City to Independence, and the north one by trains going west. McDonald, the de-ceased, resided at a station on the road called Evans-ton. He had resided at that place for five years next before the accident, and was familiar with the move-ment of the trains on the road. According to the testimony of the plaintiff, he went west to a station on the road called Sheffield, on the day of the accident,

The other evidence shows that he was on a train returning home about 8 o'clock in the afternoon of the same day. Just before reaching Evanston, he was sitting at the front end of the rear car, engaged in conversation with the conductor. One witness says he heard them say something about grading. It appears the deceased had been engaged in that business. Aside from this it does not appear what they were talking about. The train did not stop at the Evanston station, but passed by from one hundred feet to two hundred yards, as variously estimated, before it stopped. As the train checked its speed and was coming to a halt, the conductor and the deceased stepped out on the platform of the rear car. It seems the deceased got off the platform on the north side, while his train was yet in motion, and was immediately struck and killed by a train going in the other direction on and over the north track. It does not appear whether there was or was not a platform at this station, nor does it appear on what side passengers going east usually alighted.

The witness Golden, who was in the rear car, says the train slowed up, and the conductor and McDonald went out on the platform. He then looked out of the window and saw the flash of the headlight on the other train. The conductor came in and said McDonald was killed.

Gick, another passenger on the same car, says he saw the conductor and McDonald talking at the front end of the car; that when the train slowed up they went out at the front end; that the conductor had a lantern in his hand, and that the conductor stepped back and reported the death of McDonald. This witness says the train was moving. He says McDonald went out first, but he does not know what occurred on the platform.

Greenville Crisp, a passenger on the same train,

says he saw McDonald and the conductor on the plat-
form, and that the conductor was then lighting
McDonald off. Being asked what the conductor did,
he answered: "He kind of leaned over and held his
lantern out that way (indicating), and I saw him and
McDonald go down, and I turned around and heard
the explosion." This witness thinks the train was yet
in motion. On cross-examination, he said he saw
McDonald go out on the platform and get off on the
step, and that he saw the conductor holding a lantern
to light McDonald down the steps, but he did not see
McDonald get off on the ground. The conductor was
not called as a witness.

While the plaintiff's evidence leaves many things
open to further explanation, we think she made out a
*prima facie* case. As said in *Lambeth v. Railroad*, 66
N. C. 498: "He [the deceased] had a right to expect
that the defendant had employed a skillful and pru-
dent conductor, who would not expose passengers to
dangerous risks, and who had experience and knowl-
edge in his business, sufficient to correctly advise and
direct passengers as to the proper time and manner of
alighting safely from the train." In that case there
was evidence tending to show that the conductor said
to the passenger while the train was passing a platform:
"Now is your time, jump." See, also, *Bucher v. Rail-
road*, 98 N. Y. 128. The deceased was beyond doubt
a passenger on defendant's train, and the defendant
owed him that high degree of care due from carriers to
their passengers. It does not appear that the con-
ductor in words advised the deceased to get off at the
particular time and place, nor does it appear what, if
anything, the conductor said to the deceased when
they were both on the platform. But the evidence
does tend to show that the conductor went out on the
platform with the deceased, and so held his lantern as

to aid and assist deceased in getting down the steps leading to the north track, and this too while the train was still in motion. A jury might well find that such acts on the part of the conductor, unexplained as they are, amounted to and were a direction to get off then and there and on that side of the train.

It does not appear that the conductor knew of the train then approaching from the other direction, but the fact that he did not know of the close proximity of that train can not defeat the plaintiff's action; for it was the duty of the defendant to operate its trains so as to allow passengers to alight with safety. It is certainly negligence on the part of a railroad company for its servants in charge of a train to induce a passenger to get off at a dangerous place, and it may well be inferred from the evidence that the deceased got off at the particular time and place by the advice and direction of the conductor. We can not escape the conclusion that there is evidence of negligence on the part of the defendant.

The question of contributory negligence was also one for the jury to determine under the circumstances disclosed. The case is unlike that of *Weber v. Railroad*, 100 Mo. 198. There the injured person jumped from the car while it was going at full speed, in front of an approaching train, and that, too, of his own volition. Though the train now in question was moving when deceased left it, still it was moving slowly, and it can not be said, as a matter of law, that he was guilty of negligence because the train was still in motion.

If the deceased saw the approaching train, or knew it was in close proximity, then the plaintiff should not recover, but there is no evidence that he saw it or knew it was approaching. Had he looked forward before leaving the car step he would have seen it, but we can not say he was negligent as a matter of law, because he

did not look. It must be remembered that the train had passed the station; and, as the case now stands, it may be inferred that in getting off as he did, he acted on the advice and under the direction of the conductor, on whose advice he had a right to rely, unless the danger was a known, open and obvious one. Our conclusion is that the case was one for the jury on both branches.

In reaching this conclusion, we speak of the case as made by the evidence before us. Should a different state of facts appear on a new trial, the question whether a demurrer to the evidence should be sustained must be determined from the facts as they shall appear.

### IN BANC.

PER CURIAM.—The foregoing opinion, prepared by BLACK, C. J., in division number 1, is adopted as the opinion of the court *in banc*. In accordance therewith, the judgment of the circuit court is reversed and the cause remanded. BRACE, C. J., GANTT, MACFARLANE and BURGESS, JJ., concurring; BARCLAY, SHERWOOD and ROBINSON, JJ., dissenting.

BARCLAY, J. (*dissenting*).—The judgment proposed in the opinion prepared by my learned brother, Chief Justice BLACK (approved now by a majority of the court *in banc*) seems, with due respect, not in harmony with certain principles which, it appears to me, should govern the case. So my concurrence is not given to it.

His statement of the facts in judgment exhibits the chief outlines of the scene in which Mr. McDonald, the husband of plaintiff, unfortunately met his death.

But yet some other points in the testimony appear to me worthy of attention. In order to bring them out clearly, and to show their bearing on the result of the controversy, it may be well to repeat the substance of the case.

Plaintiff's relationship to Mr. McDonald was shown. They resided at Evanston Park, and had lived there about five years before his death.    Their residence was about 'a block east of Evanston station, and a block from the defendant's railway track.    From their house a full view of the trains was to be had.    Mr. McDonald frequently rode upon them.    He was forty-three years of age at the time he died.    He had often been engaged in railroad work as a contractor.    He had taken part in the original construction of the roadbed of the line at the place where he was killed.    He was familiar with the road, and the movement of the trains upon it.

The line was a short one from Kansas City to Independence, and was commonly called the "dummy" line, descriptive of the motive power used.    It had a double track.    The tracks were from three to five feet apart. At the place of the accident the tracks were straight for a considerable distance; for a quarter of a mile at least.

The general direction of the road is east and west, though at this point the tracks are somewhat deflected toward the south.    But, for convenience in the description, we will treat the line according to its general course.    About a quarter of a mile further east, the tracks curved toward the north.

The train on which Mr. McDonald was riding, before his mishap, was a regular train, going east.    He was hit by a similar train going west.    The east bound train was on the south track, and the west bound one on the north track.

Ths night of the accident, Mr. McDonald left home about 7 o'clock to go to Sheffield, the next station west of Evanston.    He was in good health.    On the return trip he was seen by several witnesses, who gave the particulars of his death.

He was observed talking in a friendly way to the

conductor, near the front end of the rear coach, where both were seated. When the train reached a point a short distance east of Evanston station, it began to slacken speed. (This distance varies, according to the versions of different witnesses, from about one hundred to six hundred feet.) The conductor and Mr. McDonald then went to the platform at the forward end of the car. The conductor had a lantern on his arm. It was dark, about 8 o'clock P. M., September 14, 1890. As the train was running slowly, the conductor held up his lantern while Mr. McDonald stepped from the car to the ground on the side toward the other track. A moment later he was struck by a west bound train on the north track, and was killed.

The plaintiff's witnesses, who describe the scene, all agree on this point. One (Mr. Golden) said:

"*Q.* After they went out on the platform what did you see or hear? *A.* I went to look out of the window to see how he was going to get off, and I saw the flash of a headlight and felt the jar; the engineer throwed the engine over, I suppose; and the conductor came in and says, 'McDonald is killed.'

"*Q.* Did you see the man get off the train? *A.* I saw him when he was going to get off, and I pulled my head in; I saw the flash of the light.

"*Q.* How long was it after you pulled your head in that you heard this noise? *A.* Almost immediately.

"*Q.* How far was the headlight from the train you were on at the time you saw it? *A.* Well, the tracks were very close together, and I don't know what rate of speed they were running at.

"*Q.* About what distance would you say it was when you looked out the window? *A.* Well, I couldn't say; I just put my head out and saw the flash of light and pulled it in again.

"*Q.* McDonald had not alighted at that time? *A.* I couldn't say; I hardly think he was; August Gick, the man I was working for at the time, asked me to open the window.

"*Q.* State whether the train you were on had come to a standstill or not? A. It was moving slowly when he got off.

"*Q.* Did you go out; did the train stop after that? *A.* Yes, sir; it stopped to pick him up."

Another witness (Mr. Gick) gave this version:

"*Q.* Now, from where he got off, down in this direction there is no obstruction, as that train goes up there, to prevent you from seeing that headlight? *A.* I think not. * * *

"*Q.* * * * What side did he get off on? *A.* He got off between the tracks * * *.

"*Q.* Now after Golden put his head out of the window, about how long was it—one, two, three or four seconds—how long was it afterwards that you heard that explosion or noise? *A.* It was almost immediately afterwards.

"*Q.* Do you mean it was in a second or two? *A.* Yes, sir."

Both of the witnesses above quoted were in the rear car in which Mr. McDonald had been sitting before he started to get off.

Another witness (Mr. Crisp) was in the car next in front. He was sitting in the rear corner on the side toward which the accident occurred.

He said that the west bound train had a headlight.

On the question of interval of time between McDonald's leaving the car and "the explosion" (which is the term he, as well as another witness, used to describe the noise of the reversal of the west bound engine, at or immediately after it hit Mr. McDonald) this witness testified as follows:

"*Q.* After you saw the conductor light McDonald down the steps, how long was it before you felt the passage of the train? *A.* As quick as I turned my back the train was by me.

"*Q.* At what time was it that you heard the explosion? *A.* A second or two afterwards."

All the facts above noted were given in evidence by witnesses produced by the plaintiff.

The defendant offered no testimony. The trial court then ruled that the finding must be for the defendant under the pleadings and evidence, giving an instruction to the jury to that effect. Accordingly, a verdict for defendant was rendered, and there was a judgment thereon, later.

Plaintiff appealed.

1. In the state of the record above described, plaintiff is entitled to have her case viewed as favorably as the facts in evidence will permit, and to have the benefit of every reasonable inference from them.

2. Whether the facts shown by plaintiff tend to make out a case is a question of law to be decided by the court, before reaching the point of submitting the evidence of those facts to the jury to pass upon its credibility.

3. The burden of proving that defendant's negligence was a proximate cause of the death of her husband, rested upon the plaintiff under the pleadings. If, in endeavoring to discharge herself of that burden, she developed, as part of her case, facts which conclusively showed that Mr. McDonald was wanting in reasonable or ordinary care for his own safety, and that such want of care directly contributed to his death, then the court was in duty bound to rule that she could not recover.

The facts must be held to conclusively establish such want of care when the court is of opinion that

they reasonably permit no other fair inference in the circumstances of the particular case.

While contributory negligence is (speaking generally) an affirmative defense, the burden of proving which devolves upon defendant in this class of actions, yet the defendant may avail itself of the evidence introduced by plaintiff, when it tends to sustain that defense. The court is bound to rule upon the legal effect of such evidence, when properly invoked to do so.

4. The principles just stated are familiar.

Applying them to the case in hand, was the plaintiff entitled to go to the jury?

The evidence fairly warrants the inference that Mr. McDonald was a passenger on the defendant's train. As such, the defendant owed him the duty to use, toward him, the highest practical care which capable and faithful railroad men should, in the opinion of the court, take in like circumstances.

The evidence also warrants the inference that the conductor was in the act of holding his lantern to give Mr. McDonald light, when he left the train. But the cars were in motion when McDonald got off. They had not come to a halt. The place was nearer to McDonald's residence than to the station. McDonald knew quite as much about the locality as the conductor. He was on friendly terms with the latter. He obviously chose the spot at which to alight when he was ready to do so. He knew that he was getting out on the side nearest the other track; that there was no platform at that point for passengers to alight upon; and that it was not an appointed place to discharge passengers, but an unusual one.

The railway company owed him a high degree of care, but he was himself also bound to use reasonable care to avoid obvious danger.

Now, looking at the immediate facts of his conduct, just before the catastrophe, would they reasonably justify the inference that he used such care?

The tracks were straight for a long distance at the point of the mishap. The west bound train had a headlight, which people in the car saw before McDonald was struck. As he stood upon the last step of the car, before leaving it, he could have seen the headlight of the coming train, had he looked in that direction. To step from the car while in motion, he naturally faced in that direction. Even if he faced straight toward the north, the column of light should have been within his view, as it was cast from the headlight for some distance in front of the locomotive, and he was struck immediately on leaving the train.

He either saw the other train and stepped off ahead of it, hoping that the last car, on which he had been riding, would pass in time for him to step aside and avoid the west bound engine, or else he did not see the approaching train or notice its light until he left the car step, and then escape was impossible.

The light of the train that hit him was obviously in plain view of a person standing where he stood before leaving the car.

There is nothing in the circumstances to excuse his omission to look out for the other train (if such was the fact), before stepping down so nearly in front of it. Still less would the circumstances excuse his move in leaving the car when he did, if he had previously observed the headlight of the other train, so near at hand.

However his act be viewed, it can not be considered consistent with the care which a person of ordinary prudence should take in such circumstances.

The facts that he was a passenger and that the conductor was "lighting him off" (as some of the wit-

nesses describe it) do not furnish any warrant for his leaving one moving train to step into such dangerous proximity to another, as he evidently did.

We do not say that it was negligence, as a matter of law, to descend from the car which was in motion. Such an act may, or may not, be negligent according to the circumstances of the special case. In those now appearing, we think Mr. McDonald could not be held to have been negligent, as a conclusion of law, merely because the car he left was moving.

But when the time and manner of his leaving the train are considered, it seems to me impossible to sanction his conduct as coming up to that standard of reasonable care which the courts are bound to maintain, and to apply to the acts of persons of full age, under the law of the land.

The case would seem to me too clear to require resort to precedents to support the conclusion foreshadowed by the foregoing remarks, were it not for the different opinion of my colleagues which alone gives me some misgivings as to the correctness of my own.

A few cases from our home reports may, however, be mentioned as illustrating the principle which should govern the present appeal.

*Weber v. Railroad* (1890), 100 Mo. 194, was a case in which a passenger was held fatally neglectful of the requirements of ordinary care, in leaving a street car at a regular street crossing where passengers were expected to alight, but he descended in such a way as to encounter another car going in the opposite direction on a parallel track, and was forced to a nonsuit on that account.

And in other instances nonsuits have been compelled or sustained where parties have stepped in front of moving trains, in circumstances which seemed,

to the court, to furnish no excuse for the failure to notice their coming. *Boyd v. Railroad* (1891), 105 Mo. 371; *Maxey v. Railroad* (1892), 20 S. W. Rep. 654.

These cases all prove that, where the court is of opinion that the conduct of the party in question shows plain and obvious negligence, directly leading to the catastrophe, there remains no issue to try. The law pronounces judgment on the probative force of the facts.

In the case in hand, no action of the conductor can reasonably be regarded as having absolved or excused Mr. McDonald from the duty to look out for the other train before stepping down from the car in the manner already narrated.

Upon the plaintiff's own showing, it could not reasonably be held that Mr. McDonald used ordinary vigilance for his own safety, at the time of his dreadful mishap. On the contrary, the evidence excludes the possibility of any just or reasonable inference or finding that he took reasonable care to avoid danger in acting as has been described by the witnesses called on behalf of plaintiff.

The trial judge, in obedience to the inexorable rules of law, declared that plaintiff was not entitled to recover. In so doing he was, in my opinion, entirely right.

Hence this respectful dissent to the judgment pronounced, reversing that ruling. It appears to me that the judgment of the circuit court should be affirmed. SHERWOOD and ROBINSON, JJ., concur in this opinion.