WARD v. ROBERT J. BOYD PAVING & CONTRACTING CO. et al.

(Circuit Court, W. D. Missouri, W. D. January 4, 1897.)

CONSTITUTIONAL LAW—CLASSIFICATION OF CITIES AND TOWNS—SPECIAL LEGIS-
LATION.
	The Missouri statute of March 18, 1893, concerning sewers and drains "for cities in the state having a special charter which now or hereafter contains more than 2,000 and less than 30,000 inhabitants," and for such cities of the third and fourth class as may by a vote of the people adopt the act, violates section 7, art. 9, Const. Mo., which provides for the division of the towns and cities of the state into four classes, and declares that the powers of each class shall be defined by general laws.

Wash Adams and Hugh C. Ward, for complainant.
Karnes, Holmes & Krauthoff, for defendants.

PHILIPS, District Judge. This is a bill in equity to enjoin the collection of certain tax bills issued by the city of Westport, in Jackson county, Mo., as a special tax assessed against complainant's property for the construction of a district sewer. The city of Westport is alleged to be a city of the fourth class, organized under the statutes of the state. The construction of the sewer in question was directed by an ordinance of the city, duly adopted, and the imposition of the special tax for the payment thereof was also authorized by ordinance of the city. This tax is claimed, by the holder of the certificates therefor, to be a special lien on a large amount of real estate in the hands of the complainant, as receiver of the Mastin estate, which it is alleged the respondents are threatening to enforce, and which constitutes a cloud upon the title to said property. It is further alleged in the bill that the basis of the action taken by said city in having said work done and said tax certificates issued is an act of the general assembly of the state of Missouri, entitled "An act concerning sewers and drains for cities in the state having a special charter which now or hereafter contains more than 2,000 and less than 30,000 inhabit-

ants, and for cities of the third and fourth classes," approved March 18, 1893. The contention of complainant is that this act is in contravention of the constitution of the state, and he therefore seeks to enjoin the collection of and have the tax certificates declared invalid. To this bill the paving company has interposed a demurrer, which has been submitted to the court on briefs of counsel.

Section 7 of article 9 of the state constitution is as follows:

"Sec. 7. Cities and Towns, Organization and Classification. The general assembly shall provide by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions. The general assembly shall also make provisions, by general law, whereby any city, town or village existing by virtue of any special or local law, may elect to become subject to and be governed by, the general laws relating to such corporations."

This provision of the constitution is both mandatory and prohibitory. Its command is not only that the legislature shall provide for the organization and classification of all cities in the state, but such provision must be by general laws, not special enactments. It then commands the classification of such cities, and interdicts the creation of more than four classes. It further commands, not only that the legislature shall define the restrictions and powers of each of said classes, but also that this shall be done by general law. It then proceeds to declare the purpose of the convention in making this requirement to be "so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions." The clear intent of which is to prevent the multiplication of classes of municipalities, and the giving to one within the same class different powers or functions, and imposing upon any one restrictions different from those in the same class or division. In short, it is to secure absolute uniformity, by general law, applicable to all the given classes, respecting the faculties with which they might be endowed, and the limitations placed upon their functions by the legislature; so that any person, anywhere, desiring to ascertain what are the powers and restrictions of any one city of a given class in the state, could be advised thereof by looking at the "general law" defining such powers and restrictions.

The legislature, in conformity with the constitutional requirement, proceeded to make the classification found in chapter 30, p. 303, Rev. St. Mo. 1889, as follows:

"Sec. 972. Cities of First Class. All cities and towns in this state containing one hundred thousand inhabitants or more shall be cities of the first class.

"Sec. 973. Cities of Second Class. All cities and towns in this state containing thirty thousand and less than one hundred thousand inhabitants shall be cities of the second class.

"Sec. 974. Cities of Third Class. All cities and town in this state containing three thousand and less than thirty thousand inhabitants, which shall elect to be a city of the third class, shall be cities of the third class.

"Sec. 975. Fourth Class. All cities and towns in this state containing five hundred and less than three thousand inhabitants, and all towns existing under any special law, and having less than five hundred inhabitants, which shall elect to be cities of the fourth class, shall be cities of the fourth class.

"Sec. 976. Villages. All towns not now incorporated in this state containing less than five hundred inhabitants are hereby declared to be villages."

Section 977 makes provision for cities existing by virtue of the
present general law, or by local or special law, electing to become
of the class to which its population entitles it, under the provisions of
this article.

It is admitted that the city of Westport is a city of the fourth
class, organized under the statute of the state. The statute (ar-
ticle 4 of said chapter) makes detailed provision concerning the
construction of sewers in cities of the third class. Article 5, which
makes general provision for the government of cities of the fourth
class, is quite meager as to any detailed provisions on the sub-
ject of sewers. The power to construct them arises by implication,
or rather seems to have been assumed by the legislature. Section
1589, after enumerating various powers to be exercised by the
city, contains this clause, "To pass such ordinances, not inconsist-
ent with this article, as may be expedient in maintaining the peace
and good government, health and welfare of the city," from which,
possibly, it might be assumed that as, by general consensus, the con-
struction of sewers and proper drainage is essential to maintain the
public health, authority to construct them is within the terms of
the grant. Section 1592 declares, inter alia, that "all special tax
bills issued as herein provided for special assessments for paving,
macadamizing, curbing, guttering, grading, excavating, building,
and repairing streets, alleys, avenues, and sidewalks, as well as
sewers," etc. On the 11th day of April, 1895 (Laws Mo. 1895, p.
66, which went into effect on the date of adoption), the legislature
enacted a general law respecting the government of cities of the
fourth class, which sets out in detail the powers of such cities, con-
ferring in express terms the power, in section 75, to cause a gen-
eral sewer system to be established, composed of three classes of
sewers, to wit, public, district, and private sewers. It then defines
where said public sewers shall be constructed, and as to their
dimensions, and further provides for the levying of a tax on all
property made taxable for said purpose over the whole city to
pay therefor; and the succeeding sections provide for a system
of district sewers, and the mode of construction, and the manner
of paying therefor. So that this act and the one in question were
in force at the time of the adoption of the ordinances of the city
of Westport under which it is alleged the work in question was in-
augurated.

The bill charges, and the arguments of both parties concede, that
said ordinances were adopted pursuant to the provisions of said
act of 1893. The first section of this latter act declares that:

"In every city in this state having a special charter which now or hereafter
contains more than two thousand and less than thirty thousand inhabitants,
and in every city in this state of either the third class or of the fourth class,
the acting municipal authorities thereof, upon a vote by ballot of two-thirds
of the qualified voters of such city, voting at an election held for that pur-
pose, in favor of adopting the provisions of this act, shall have the power by
ordinance to provide drains and sewers for the same, and to enforce and
regulate connections therewith; and every such city shall, on the written peti-
tion of the resident owners of a majority of the front feet of ground in sewer
districts to be established as hereinafter provided, or when such municipal

authorities shall deem any sewer necessary for the protection of the public health, have power to accept and acquire by gift, devise, purchase or by condemnation proceedings, both within and beyond the territorial boundaries of such city, the right of way for drains or sewers, and the use of natural water courses of drainage for public drainage and sewer purposes for such city."

In disregard of the provisions of said section 977 of the Revised Statutes, and regardless of the special charters under which cities may have been organized, the powers thereby conferred, and the restrictions thereby imposed, the first section of the act of 1893, by way of amendment to such special charters, declares that, in every city having a special charter which now or hereafter contains more than 2,000 and less than 30,000 inhabitants, authority is given by a vote of two-thirds of the qualified voters to construct sewers, with all the powers and privileges conferred by this special act; thus, in effect, creating a fifth class, composed of special chartered cities of a special population. In the first place, it is to be observed that under said section the power to build sewers does not come into existence until invoked by the ballots of two-thirds of the voters of said city. So that this is a power subject to such condition. Then, section 2 of the act declares that:

"Before authorizing or constructing any sewer or drain under the provisions of this act, the acting municipal authorities of such city shall by ordinance subdivide the territory of such city into two or more sewer districts."

There is no provision in the act for constructing public sewers to be paid for as a general tax assessable against the whole property of the municipality, and, before any sewer can be constructed, the city government must subdivide it into two or more districts, and the vote of the whole city may compel any district therein to build a sewer at the expense of the taxpayers of the district; whereas, under the general law, both in respect to cities of the third and fourth classes, the board of aldermen are authorized (section 75) to cause a general sewer system to be established, including public, district, and private sewers. No vote of the constituency is required to confer this power under the general law upon the board of aldermen. Section 76 of the general law provides for district sewers which may connect with public sewers, thereby lessening, we assume, in many cases, the expense of construction to the district; and they may be built "whenever a majority of the property holders resident therein shall petition therefor"; and the board of aldermen, without such petition, may construct such sewers "whenever the board shall deem such sewers necessary for sanitary and other purposes." Section 3 of the act of 1893 authorizes the city to make use of any natural course of drainage or water course as a public drain or sewer route, either within or beyond the territorial boundaries of the city; and the municipal authorities are authorized to declare the same to be a public drain and sewer route, and to declare what district or districts shall be deemed benefited thereby, and further authorizes the city to acquire the right thereto by gift, purchase or condemnation, and imposes a tax on the declared benefited territory therefor. Sections 4, 5, 6, and 12 of this spe-

cial act empower the city to construct such sewers, with inlets, branches, and appurtenances either wholly within one sewer district, or partly in two or more, and partly beyond the territorial boundaries of the city, and impose special tax bills therefor; and the city is further empowered to acquire the right of way for said sewers through private property within or beyond the corporate boundaries of the city in the same way, with special provisions for condemnation proceedings, and for the condemnation to its use of water ways. Said section 12 declares that the whole cost of acquiring the use of such water courses and right of way for any such sewer, including cost of condemnation proceedings, shall constitute a lien on the lands within the district or districts, exclusive of public highways, streets, and alleys declared to be benefited, in proportion to the area of such tract, and shall be collected by special tax bills. No such provisions are found in the general law respecting cities of the third and fourth classes, and no such burdens on sewer districts are imposed. Under the general law (section 76) the taxes for district sewers shall be apportioned "against the lots or pieces of ground exclusive of improvements, in proportion to the area of the whole district exclusive of the public highways"; whereas under the act of 1893 (sections 14 and 15) the tax is authorized to be imposed upon the lands, omitting the words, "exclusive of improvements," so that both the land and the improvements, as an appurtenant of the freehold, are subject to the special tax. Under the general statute (section 76) only one certified tax bill is required to be made out upon an assessment against each lot or piece of ground within the district, "in the name of the owner thereof"; whereas, by section 15 of the act of 1893, "three special tax bills, each for one third of the amount of the special tax against each lot or tract of land in the district or districts," are authorized. Each of said tax certificates shall be payable, respectively, on or before one, two, or three years, with interest from the date thereof at the rate of 10 per centum per annum until paid; whereas, under the general law (section 76), the tax bill shall bear interest at the rate of 10 per cent. from the issue thereof, and, if not paid within six months, bear interest at the rate of 15 per centum per annum. And section 16 of the act of 1893, at variance with the general law, expressly declares that "no such tax bill need give the name of any party owning or interested in any land charged and bound by the lien." Section 77 of the general law prohibits any sewer being run diagonally through private property when it is practicable, without injury to such sewer, to construct it parallel with one of the exterior lines of such property; nor shall any public sewer be constructed through private property when it is practicable to construct it along a street or other public highway. No such restrictions are imposed by the act of 1893. There are other differences in the powers conferred by the two enactments.

So, it is made apparent that, where the voters of cities of the third and fourth classes should decline by a two-thirds vote to put in operation the act of 1893, such cities would be left with the

right to avail themselves of the powers, and be subject to the restrictions, of the general law for the government of cities of those classes. Thus, it becomes too manifest to admit of debate that, under the operation of these two statutes, cities in this state of the same class may exist not possessing the same powers nor subject to the same restrictions in the manner of constructing sewers. A city whose qualified voters should vote on themselves the burden of constructing sewers under the act of 1893 would thereby become possessed of powers greater and widely different from those possessed by another city of the same class whose voters declined to come under the law of 1893. Likewise, as shown by the foregoing comparison of the two statutes, we would have cities in the same state of the same class, subject to different restrictions in the manner of constructing sewers. It is no answer to this to say that the act of 1893 is general in its nature, as it applies to all cities of the given class who may vote to come under it.

As said by the supreme court of this state in Murnane v. City of St. Louis, 123 Mo. 479–488, 27 S. W. 712:

"As to any city organized under the classification directed by the new constitution, it is not alone sufficient that an amending law be a general one. Such amendment must not only be by general law, but that law must also conform to the classification of cities which that section (meaning section 7, aforesaid) of the constitution requires as to those cities organized since its adoption. No change of strictly corporate powers, in cities incorporated under the laws authorized by the constitution of 1875, can be sustained merely because such laws are general in form, as in the Rutherford Cases [82 Mo. 388; 11 S. W. 249]. Such laws must also comply in other respects with the demands of section 7. The number of classes of cities and towns for whose organization the legislature 'shall provide' is limited to four; and any general law conferring strictly charter powers upon a city, under the present organic law, must be so framed as 'that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions.' "

And speaking to the same subject, in Kansas City v. Scarritt, 127 Mo. 653, 29 S. W. 848, the court says:

"There was no design to isolate any of the cities from the great body of the people of the state, or to grant to any city special immunities or privileges. On the contrary, the idea was to place all those in like situation under like laws, civic duties, and obligations."

The act of 1893, in its practical effect, creates an additional class of cities. It provides for the recognition of cities having special charters "which now or hereafter contain more than two thousand and less than thirty thousand inhabitants," and also applies to cities termed as "of either the third or of the fourth class" whose municipal authorities may build district sewers, with peculiar powers, "upon a vote by a ballot of two-thirds of the qualified voters of said city, voting at any election held for that purpose in favor of adopting this act." Without such vote the power to construct sewers, with the privileges accorded by the act, does not come into existence. When two-thirds of the inhabitants do so vote, there exists a new class of cities, clothed with powers and privileges possessed by no other class of cities in the state; whereas the positive mandate of the constitution is that all cities, by a general law, shall be classified into not more than four classes, and the

cities of each class shall be clothed with the same powers, to be "defined by general laws." The powers thus to be conferred by the legislature are to be vested in "such municipal corporations"; that is, in the legal entity, the body corporate, to be exercised by it in its corporate capacity, not dependent upon the consent of a changeable, varying constituency, but upon the exercise of a sound legislative discretion by the governing board of the municipality. The general law of 1895 (section 76) empowers the board of aldermen, whenever "it shall deem such sewers necessary for sanitary or other purposes," to construct district sewers. This is in conformity with the sense of the constitutional convention expressed in section 7 of article 9; whereas, under the act of 1893, the power of the board of aldermen to construct sewers is made to depend absolutely upon the vote of a given number of inhabitants. And it is worthy of repetition to say that under these two acts of the legislature, where the inhabitants of one city exercised their option by a two-thirds vote to come within the operation of the act of 1893, and another city stands still, whereby it is nevertheless left armed with power to obtain sewers by the legislative action of the governing board, the state of case is presented either of two cities of the same class clothed by the legislature of the state with different functional powers, and subject to different restrictions in proceeding in the construction of sewers, or there is a fifth class of cites created. These two enactments cannot stand together. The one is special; the other is general. The legislature, in the later enactment of 1895, has made provision by general law applicable alike to cities of the third and fourth classes; and it does seem to me that, if the special act of 1893 does not fly in the face of the constitution of the state, it must be confessed that human language is inadequate to put under restraint the great evil of special legislation in this state. It was to the suppression of the great evil of favoritism through such enactments and the incongruities in our laws for the government of different communities of the commonwealth that the members of the convention of 1875 bent their best energies and gave their best thoughts.

As said by the state supreme court in Kansas City v. Scarritt, supra:

"City charters were the favorite ground for special legislation. The constant tinkering to which those instruments were subjected, not only created confusion and uncertainty in constructing the law, but covered the state with specimens of incongruous pieces of patchwork legislation, which gave widely varied rights to, and imposed dissimilar duties and obligations on, the citizens of different localities, without any substantial grounds for those variances. The object of the constitution of 1875 in dealing with this topic was to secure some uniformity in the organization and action of municipal corporations in the state; hence the strict limitations laid down in regard to the classification of cities, and the prohibition of more than four classes of city charters, even when created by general laws of incorporation, under the new constitution."

So profoundly concerned were the framers of the constitution to vindicate their purpose in this respect, in recognition, on the one hand, that this abuse sprung largely from the incautiousness or

incompetency of legislators,—to say nothing of the method of "log rolling" by which measures are gotten through, having the form and substance of general laws, but in design and practical operation solely for the benefit of a particular locality,—and recognizing, on the other hand, the timidity of some courts, with a mawkish deference to a co-ordinate branch of government, in hesitating unduly to declare its acts unconstitutional, that they wrote into the fundamental law the provision that whether or not the subjects-matter of legislative acts could by "a general law be made applicable in any case is hereby declared a judicial question, and as such shall be judicially determined, without regard to any legislative assertion on that subject." Section 53, art. 4.

To one familiar with the history of the city of Westport, its municipal aspirations and environments, in whose interest the act in question had its birth, the relevancy of its provisions to that locality are as apparent as though it had been entitled "An act for the construction of sewers in and about the city of Westport, in this state." Without questioning the benefits to certain of the inhabitants of this city coming from this special statute, the solemn duty rests upon the court to follow where, in its judgment, the constitution—the supreme law of the land—leads. It results from the views of this statute entertained by the court that the demurrer should be overruled. It is accordingly so ordered.